C. O. FUNK & SON, INC., a/k/a JNF Enterprises, Inc., *et al.*, Plaintiffs-Appellees, *v.* SULLIVAN EQUIPMENT, INC., *et al.*, Defendants.—(FIRST NATIONAL BANK AND TRUST COMPANY OF TUSCOLA *et al.*, Intervening Defendant-Appellant.)

Fourth District    No. 16277

Opinion filed January 12, 1981.

Perry S. Albin, of Tuscola, for appellant.

Miller & Tracy Law Offices, P. C., of Monticello, for appellees.

Mr. JUSTICE MILLS delivered the opinion of the court:
First impression.
Uniform Commercial Code.
Section 9—306(2).
How do we define "identifiable proceeds"?
We must first look at the background.

On March 31, 1978, plaintiffs (Funk) sold their farm-implement business, including inventory, to defendants (Sullivan). In connection with that sale, Funk retained a security interest in certain specifically listed items of farm-equipment inventory (referred to by the parties as "bill of sale items") and their proceeds. The financing statement which perfected that security interest was filed on April 3, 1978, prior to any other filing concerning that collateral.

The contract of sale between Funk and Sullivan provided that Sullivan, upon selling a bill of sale item, was to deposit into an escrow account 90% of the amount paid for that item. However, during the 18-month period between June 22, 1978, and December 17, 1979, Sullivan's deposits into the escrow account became $29,673.73 in arrears.

On December 18, 1979, Sullivan planned to sell at auction certain items of its farm-implement inventory. On the day before the auction, Funk obtained a temporary restraining order requiring Sullivan to deposit the auction proceeds (less expenses of the auction) with the court. The court also allowed an oral motion by the First National Bank and Trust Company of Tuscola (bank) to intervene. The bank's interest in the suit arose from Sullivan's debt to the bank in the amount of $425,596.78, which was secured at least in part by a security interest in Sullivan's farm-implement inventory and its proceeds. The bank's security interest also covered Sullivan's after-acquired inventory. In this appeal, Funk and the bank each claims that it has a prior perfected security interest in the $29,673.73 now on deposit with the trial court.

The gross receipts of the auction totaled $115,871.52. Some bill of sale items were sold, and the bank has conceded that Funk—under its prior perfected security interest in those items—was entitled to their cash proceeds. Funk, on the other hand, has claimed only the $29,673.73 arrearage, and the parties therefore stipulated to the distribution of all but that amount of the auction receipts.

Thus, the funds now held by the court represent receipts from the sale of farm equipment other than bill of sale items. Funk, however, claims that since its security interest also covered proceeds of bill of sale items, it has a prior perfected security interest in the cash held by the court. That claim is grounded upon sections 9—306(1) and (2) of the UCC (Ill. Rev. Stat. 1979, ch. 26, pars. 9—306(1), (2)):

"(1) 'Proceeds' includes whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds. Insurance payable by reason of loss or damage to the collateral is proceeds, except to the extent that it is payable to a person other than a party to the security agreement. Money, checks, deposit accounts, and the like are 'cash proceeds'. All other proceeds are 'non-cash proceeds'.

(2) Except where this Article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any *identifiable proceeds* including collections received by the debtor." (Emphasis added.)

Funk contends that the cash held by the court constitutes "identifiable proceeds" of the bill of sale items.

Funk's identification process takes us through the following steps:

(1) During the 18-month arrearage period, Sullivan sold certain bill of sale items for cash.

(2) The cash from these sales was deposited into Sullivan's general checking account. (Deposits from other sources were also made into this account.)

(3) From the general checking account, Sullivan bought farm equipment inventory which the parties have labeled "second generation inventory." (This account was also used for Sullivan's other business expenditures.)

(4) The second generation inventory was traded for other farm equipment, which the parties refer to as "third generation inventory."

(5) The third generation inventory was sold at the December 18, 1979, auction, and the cash arising from that sale was deposited with the trial court pursuant to the temporary restraining order of December 17, 1979.

Uncontroverted testimony and exhibits stipulated to at trial amply support the factual allegations involved in these various steps. The question for us is simply this: Do these facts support the trial court's ruling that the funds held by the court are identifiable proceeds of the bill of sale items?

The UCC gives us no guidance concerning what the term "identifiable proceeds" means or what evidence a party must produce in order to prove that certain cash represents identifiable proceeds of collateral. The relatively few cases on this issue have referred to the identification process as a matter of "tracing" proceeds from one form to another. (*Brown & Williamson Tobacco Corp. v. First National Bank* (7th Cir. 1974), 504 F.2d 998; *Universal CIT Credit Corp. v. Farmers Bank* (E.D. Mo. 1973), 358 F. Supp. 317.) In no other reported case has a party sought to go through as many steps as are involved in Funk's tracing process.

■■ However, nothing in section 9—306 would preclude us from finding adequate tracing merely because Funk's path from the bill of sale items to the cash held by the court involves numerous steps. Section 9—306(1) defines "proceeds" as "whatever is received upon the sale, exchange, collection or other disposition of collateral or *proceeds*." (Emphasis added.) Since proceeds result from the disposition of proceeds, a party may go through as many steps as necessary in his tracing. See Hawkland, *The Proposed Amendments to Article 9 of the UCC, Part II: Proceeds*, 77 Com. L. J. 12 (1972).

The bank contends that when Sullivan sold bill of sale items and placed the receipts into the general account, which contained funds from other sources, the proceeds became unidentifiable. Although Professor Gilmore, a leading commentator on article 9, has expressed this view (2 Gilmore, Security Interests in Personal Property §27.4, at 735-36 (1965)), the case law authority is almost unanimously to the contrary (*Brown & Williamson Tobacco Corp. v. First National Bank* (7th Cir. 1974), 504 F.2d 998; *Universal CIT Credit Corp. v. Farmers Bank* (E.D. Mo. 1973), 358 F. Supp. 317; *Domain Industries, Inc. v. First Security Bank & Trust Co.* (Iowa 1975), 230 N.W.2d 165; *Citizens National Bank v. Mid-States Development Co.* (Ind. App. 1978), 380 N.E.2d 1243). The only case we have found that holds otherwise is *Morrison Steel Co. v. Gurtman* (1971), 113 N.J. Super. 474, 274 A. 2d 306. There, however, the court was construing section 9—306(4)(d), which is inapplicable to the facts of this case.

We agree with the court in *Brown & Williamson* that section 9—205 of the UCC (Ill. Rev. Stat. 1979, ch. 26, par. 9—205) supports a holding that commingling cash proceeds with other funds does not necessarily make those proceeds unidentifiable. (See also *Michigan National Bank v. Flowers Mobile Homes Sales, Inc.* (1975), 26 N.C. App. 690, 217 S.E.2d 108.) That section provides in part that a security interest is not invalid or fraudulent against creditors because of the debtor's freedom to commingle. Thus, section 9—205 expresses a policy of not punishing a secured party for giving a debtor freedom to commingle proceeds. We would contravene that policy were we now to say that the act of commin-

gling makes the proceeds *per se* unidentifiable, thereby destroying the lender's security interest.

Nor does the fact that Sullivan made these deposits in violation of the security agreement affect Funk's right to attempt to identify the proceeds. The official UCC comments to section 9—205 state that that provision was intended to protect a secured party who fails to police extensively a debtor's commercial activities. Thus, the fact that Funk did not take action, during the arrearage period, to require Sullivan to make deposits into the escrow account is not a factor to consider in determining whether the proceeds can remain identifiable after being commingled in the general account. See *Commercial Discount Corp. v. Milwaukee Western Bank* (1974), 61 Wis. 2d 671, 214 N.W.2d 33.

■■ Consequently, a secured party's interest in cash proceeds remains perfected even though deposited, in violation of the security agreement, into an account containing funds from other sources. See Note, *Conflicts Between a Bank's Common Law Right of Setoff and a Secured Party's Interest in Identifiable Proceeds*, 9 Loy. Chi. L.J. 454 (1978); Note, 48 Temp. L.Q. 839 (1975).

The bank also contends that Funk presented insufficient evidence at trial to support a finding that the cash held by the court is identifiable proceeds of the bill of sale items. This contention can be made only with respect to one of the five steps in Funk's tracing process. Uncontroverted testimony establishes that bill of sale items were sold for cash and that that cash was deposited in Sullivan's general account. Working backward, there is no dispute that the funds now held by the court came from the sale of third-generation inventory. Also, the exhibits admitted into evidence by stipulation of the parties show that Sullivan had acquired each item of third-generation inventory in a trade-in in which Sullivan gave up an item of second-generation inventory. The only step that remains is the purchase of second-generation inventory with cash in the general account. This is the weakest link in Funk's tracing chain, and unless the evidence on that point is sufficient, Funk has failed in the attempt to prove that the court holds identifiable proceeds.

As we noted above, the UCC gives no guidance on what a party must show in order to identify proceeds. Under such circumstances, section 1—103 of the UCC (Ill. Rev. Stat. 1979, ch. 26, par. 1—103) provides that the principles of law and equity shall "supplement" the UCC provisions. A number of courts faced with the question whether certain funds are identifiable proceeds under section 9—306 have supplemented that section with the tracing principles developed in the law of trusts. (*Brown & Williamson Tobacco Corp. v. First National Bank* (7th Cir. 1974), 504 F.2d 998; *Universal CIT Credit Corp. v. Farmers Bank* (E.D. Mo. 1973), 358 F. Supp. 317); *Associates Discount Corp. v. Fidelity Union Trust Co.*

(1970), 111 N.J. Super. 353, 268 A.2d 330.) Both the bank and Funk have suggested that application of trust principles would be appropriate.

When a trustee commingles trust assets with his own funds and then spends from that commingled account, the courts conclusively presume that he has spent first from his own funds. (*People v. Barrett* (1950), 405 Ill. 188, 90 N.E.2d 94; *People ex rel. Nelson v. People's Bank & Trust Co.* (1933), 353 Ill. 479, 187 N.E. 522.) Thus, the trust funds remain intact unless and until the trustee spends an amount in excess of the amount of his own funds that have been deposited into the account. It appears that all the courts applying this principle under section 9—306 have done so in cases in which a secured party has sought to retrieve the funds that had been in a debtor's bank account before the depository bank exercised its right of setoff against the account. In those cases, the trust law presumption is invoked to save the security interest—*i.e.*, despite a debtor's expenditures out of a commingled account, the secured party has been found to have a perfected security interest in the funds still in the account at the time the bank exercised its setoff. *Universal CIT Credit Corp. v. Farmers Bank* (E.D. Mo. 1973), 358 F. Supp. 317; *Associates Discount Corp. v. Fidelity Union Trust Co.* (1970), 111 N.J. Super. 353, 268 A. 2d 330. See generally *Citizens National Bank v. Mid-State Development Co.* (Ind. App. 1978), 380 N.E.2d 1243.

But in this case, the secured party wants to prove that the special funds in the commingled account were spent, not that they were retained in the account. Thus, application of the trust law principles of tracing would be detrimental to the secured party. We cannot, however, simply for that reason say that such principles should not be applied here.

The outcome of this case hinges on the question whether Funk presented sufficient evidence at trial to prove that the money Sullivan used to pay for the second-generation inventory was the proceeds from the sale of bill of sale items. But before we look to the evidence presented, we must first determine what standard to apply in deciding whether Funk has met its burden.

■■ We find no case dealing with section 9—306 which has enunciated the evidentiary standard that a secured party must meet in proving that something constitutes identifiable proceeds of collateral. Our only guidance comes from the somewhat stark language of the statute. We think that the use of the word "identifiable" in section 9—306(2) indicates a legislative intent that a secured party present evidence that proves that the alleged proceeds arose directly from the sale or other disposition of collateral and that these alleged proceeds cannot have arisen from any other source.

Applying trust law tracing principles along with this standard, we find Funk's evidence to be woefully inadequate. Funk introduced neither

oral nor documentary evidence of the balance in the general account at any time during the arrearage period. We know only that money from other sources was also deposited into the account and that many expenses other than the purchase of second-generation inventory were paid from the account. Without any evidence showing the day-to-day balance in the account, the trial court had no means of determining whether, at the time a certain item of second-generation inventory was purchased, there was (under analogy to the law of trusts) sufficient money from other sources to pay for it, or if the purchase required dipping into the proceeds.

Other cases involving commingling have required a secured party to produce evidence of bank balances during the commingling period. The court in *Girard Trust Corn Exchange Bank v. Warren Lepley Ford, Inc.* (1958), 25 Pa. D. & C. 2d 395, said that a party can trace through several steps, including going through a commingled account. However, the court stated:

> "With regard to this petition, it has been assumed that the facts demonstrate that the bank has been able to trace through the proceeds of sale of the original automobiles into the automobiles turned over to the receivers. We are not convinced that this has been satisfactorily done. * * * The parties should determine what other monies were in the Girard and Fidelity bank accounts at the time the new automobiles were purchased. There should be determined the daily balance in each account and the parties may consider whether tracing is limited in any way if funds from other sources were present in these bank accounts." (25 Pa. D. & C. 2d 395, 402-03.)

The court in *Universal CIT Credit Corp. v. Farmers Bank* (E.D. Mo. 1973), 358 F. Supp. 317, applying trust law doctrines, said that when proceeds have been commingled in a general account, the "lowest intermediate balance rule" should be applied whereby the amount of proceeds remaining in the account is no greater than the lowest level to which the account has dropped during the time span in question, plus whatever proceeds are deposited into the account after that lowest level. That, of course, requires a look at the bank records.

Also relevant is the bankruptcy case of *Howarth v. Universal CIT Credit Corp.* (W.D. Pa. 1962), 203 F. Supp. 279. UCIT had a security interest in the bankrupt's (Spohn's) inventory of new cars and their proceeds. During the four months before Spohn entered bankruptcy, he transferred funds in his bank account to UCIT. The issue was whether the transfer was a voidable preference. UCIT claimed a security interest in the money as proceeds from the sale of cars. The court said:

> "Apparently UCIT has not been able to trace any of the money in the bank to proceeds from the sales of collateral on which it held a

security interest. The defendant argues that the money must have come from the sale of property in which it had a security interest. This is an unwarranted assumption for all of it could have come from services rendered, sale of Spohn's common stock, or loans to Spohn.

The court may not assume the source of the money in the bank. The burden is upon UCIT to trace cash proceeds received by Spohn from the disposition of secured collateral into the bank deposits. This it has not done." (203 F. Supp. 279, 282.)

We agree with the *Howarth* court that we may not "assume" that the money spent for second-generation inventory was proceeds of bill of sale items. Funk's failure to produce records of Sullivan's general account that would show, under analogy with trust law, the source of the money being spent on second generation inventory is fatal to its case.

Funk suggests, however, a method of tracing that would excuse it from presenting Sullivan's bank records. Funk says the court should look to Sullivan's "large asset picture" during the arrearage period. The trial judge's lengthy memorandum order, which demonstrates a commendable effort to be thorough and to render a proper decision, utilized the tracing method Funk advocates:

"Earmarking of funds into or out of the general account is not required under the facts of this case. * * *

The receipts and expenses of Sullivan Equipment went solely into and out of the general corporate account at the Tuscola bank. The flow of proceeds into and out of the account was a continuous one. The chain of traceability has not been broken. All that is necessary is that the general flow of proceeds at any given time be traced back to the original collateral. The court does not believe that it was the intent of the legislature to require a dollar for dollar identification of funds or to prohibit the mutation of proceeds in order to comply with the principle of 'identifiable proceeds.' "

Neither Funk nor the trial court cites case law authority for this method of tracing. Of course, section 9—306 does not specifically either preclude or allow it. Further, we agree with Funk that the trust law method of tracing is one that courts have used by analogy; it is not dictated by the UCC.

But besides the lack of authority on point, strong policy considerations dictate against our adopting the very loose definition of "identifiable proceeds" that Funk urges upon us. This case pits an inventory financier with a security interest in after-acquired inventory (bank) against a purchase-money financier (Funk). If the purchase-money financier can, through the "large asset picture" method of identifying proceeds, easily acquire a prior perfected security interest in after-acquired inventory, the inventory financier is not protected to the extent he rightly

expected to be protected upon lending funds to the debtor. The bank did, of course, have notice of Funk's prior perfected security interest in the bill of sale items and their proceeds. However, were we to hold, as Funk urges, that virtually any equipment is proceeds if it was purchased during the time proceeds from bill of sale items were being deposited into the general account, we would make the word "identifiable" in section 9—306 practically meaningless.

We concede, as Funk contends, that section 9—306 is designed to assure secured parties that their security interests can continue into the proceeds of collateral. Thus, a party like Funk is clearly intended to be a beneficiary of that provision. However, the Code also seeks to protect the inventory financier—a party whose backing is often imperative if the debtor is to continue in business. (See, *e.g.*, section 9—204(1) (allowing security agreements covering after-acquired collateral) and section 9—312(3) (making it unlikely that an inventory financier, with a security interest extending to proceeds of inventory and to after-acquired inventory, will lose his position of priority to a party making later loans for the purchase of inventory).) Before an inventory financier's perfected security interest in after-acquired inventory can be found to be inferior to another party's perfected security interest in proceeds of collateral, that other party must present a stronger case of identification of proceeds than Funk's "large asset picture" theory would require.

■ Because the evidence produced at trial was insufficient to support a finding that the funds held by the trial court are proceeds of collateral in which Funk had a prior perfected security interest, we reverse the trial court's judgment in favor of Funk and remand for the trial court to enter an order dissolving the preliminary injunction pursuant to which these funds are being held, and to order the funds distributed to the bank.

Reversed and remanded.

TRAPP, P. J., and GREEN, J., concur.