In re HIGHLAND PARK ASSOCIATES LIMITED PARTNERSHIP I, an Illinois limited partnership,

and

River Park, Inc., f/k/a Brickman Limited, an Illinois corporation d/b/a Highland Park Country Club, Debtors.

Bankruptcy Nos. 91 B 00887, 91 B 00888.

United States Bankruptcy Court, N.D. Illinois, E.D.

July 16, 1991.

Mark S. Lieberman, David A. Golin, Rosenthal & Schanfield, P.C., Chicago, Ill., for the debtors.

John S. Mrowiec, Edward S. Weil, Greenberger, Krauss & Jacobs, Chicago, Ill., for LaSalle Nat Bank.

Richard C. Friedman, Dept. of Justice, Office of U.S. Trustee.

Michael L. Molinaro, Katten, Muchin & Zavis, Chicago, Ill., for Christopher Burke Engineering.

Matthew Hurd, Wildman, Harrold, Allen & Dixon, Chicago, Ill., for Highland Park Country Club Note Associates.

Jerome H. Torshen, Mark F. Schoenfield, Torshen, Schoenfield & Spreyer, Chicago, Ill., for William Brickman.

Arthur G. Simon, Dannen, Crane, Heyman & Simon, Chicago, Ill., for Robert and Michael Brickman.

## MEMORANDUM OPINION

RONALD S. BARLIANT, Bankruptcy Judge.

The LaSalle National Bank ("LaSalle Bank"), has moved for relief from the automatic stay or for dismissal or conversion of these chapter 11 cases to chapter 7. The LaSalle Bank wants to foreclose its mort-

gage on the Debtor's golf course and adjoining property. LaSalle Bank has also moved for the turnover of proceeds or sequestration of proceeds of the operation of the Debtors' country club. Initially, LaSalle Bank also moved to shorten the exclusivity period, but that motion is now moot because that period has expired. The Debtors, however, have moved for an extension of time during which they have the exclusive right to file a plan. For the reasons explained below, the Court finds that the property in question is not necessary to an effective reorganization of the Debtors, and, since it is agreed that they have no equity in it, the motion for relief from the automatic stay will be granted. The LaSalle Banks' other motions are denied. The Debtors' motion is granted.

## BACKGROUND

There are two Debtors in this case, River Park Inc., and Highland Park Associates Limited Partnership I, "HPA". River Park's only asset is the beneficial interest in an Illinois Land Trust that owns the Highland Park Country Club and adjoining land. HPA's only asset is its stock in River Park. All references to "the Debtor" are to River Park. HPA's purchase, in 1989, of the River Park stock was financed by a $10.1 million LaSalle Bank note secured by a mortgage. The Note was later increased to $10.8 million and the maturity extended to October 31, 1990. As of April 30, 1991, the indebtedness to LaSalle Bank was approximately $11.6 million.

HPA purchased the stock of River Park in order to construct a development of 316 residential units on a portion of the golf course and adjoining land. This required, among other things, rezoning by the City of Highland Park and approvals by the Army Corps of Engineers (because there are wetlands on the property) and other governmental agencies.

On January 22, 1990, the Highland Park City Council approved a preliminary plan contingent upon the Debtor obtaining various special use permits. This preliminary approval, however, vested no rights in the Debtor other than being allowed to present a final development plan. In its preliminary approval, the City Council stated that the final development plan would be conditionally approved subject to compliance with a series of conditions. Among other things, the Debtor had to: satisfy the City as to the extent of wetlands on the property and on certain adjacent property; design, construct and pave Western Avenue between Half Day Road and Park Avenue; draw up an engineering plan for whatever public improvements are deemed necessary by Highland Park's City Engineer, secure all necessary easements, and obtain engineering approval for this plan; replace existing water mains; construct a storm water management system, including the construction of a storm water detention lake and necessary pumps and improvements; construct and install a 36 inch storm water outfall sewer; sub-divide the land as required by the City, and secure the approvals of all utility companies for such subdivision; retest certain test wells and complete abatement measures. The Debtor failed to make the six month deadline for filing final plans, and the City of Highland Park takes the position that the preliminary approval has lapsed.

The Debtor failed to pay the amounts due under the Note. It also failed to pay the second installment of 1989 real estate taxes and may have defaulted on other obligations as well. On December 28, 1990, LaSalle Bank filed its Complaint to Foreclose, and on January 15, 1991, the Debtors filed their separate chapter 11 petitions.

In the course of the trial, the Debtor proposed three, less ambitious development scenarios. The one most favored by the Debtor does not involve re-zoning, but does require that the City, at its own expense, construct and maintain a connecting road and a storm water management plan, including the acquisition of the required land. The Debtor also presented a letter of intent, "The Scarsdale Letter," in which Scarsdale Homes proposes to put up as much as $400,000, and has tendered to the Debtor a $50,000 check as earnest money. This opinion will consider the issues in connection with both the original, and the

more recent development plans in mind, and will also consider the Scarsdale Letter.

All these motions present matters within this Court's core jurisdiction. This opinion constitutes the Court's findings of fact and conclusions of law.

## DISCUSSION

### I. *Motion to Lift the Automatic Stay*

The Court is required to grant relief from the stay if (A) the Debtor does not have an equity in the property, and (B) the property is not necessary to an effective reorganization. 11 U.S.C. § 362(d).

#### A. Does the Debtor have an equity in the property?

According to the dominant, and better reasoned view, the Debtor has no equity in the property. "The majority has adopted the definition relied upon by the bankruptcy court below: that 'equity' refers to the difference between the value of the property and all encumbrances upon it." *Stewart v. Gurley*, 745 F.2d 1194, 1195 (9th Cir.1984), followed in the Seventh Circuit by *In the Matter of Jones*, 119 B.R. 996 (Bkrtcy.N.D.Ind.1990). In the case before us, secured claims exceed $22 million. Statement of Uncontested Facts, ¶ 43. Even the Debtor's appraiser only valued the property at around $16 million. The Debtor does not have an equity in the property.

#### B. Is the Property Necessary for an Effective Reorganization?

The Debtor has the burden of showing that the property is necessary to an effective reorganization. Section 362(g); *United Savings Assn. v. Timbers of Inwood Forest*, 484 U.S. 365, 375, 108 S.Ct. 626, 632, 98 L.Ed.2d 740 (1987). What this means is that there "must be a reasonable possibility of a successful reorganization within a reasonable time," and that the property is necessary to that reorganization. *Timbers* at 376, 108 S.Ct. at 632. There is no doubt, of course, that any reorganization would require this property; the question is whether there is a reasonable

possibility of reorganization within a reasonable time frame.

Courts have lifted the stay when re-zoning was an issue. In *In re Boca Development Assoc.*, 21 B.R. 624 (Bkrtcy. S.D.N.Y.1982), the debtor's major asset was 41 acres of vacant land. The debtor had planned to construct a shopping center, which required re-zoning from agricultural to commercial use. Although the debtor was optimistic about the re-zoning, the application could take six months or longer. The debtor had no financing in place, and no equity in the property. The court lifted the stay. In doing so, it pointed to the length and uncertainty of the re-zoning process, and to the lack of financing. "Although a reorganization contemplated along the lines anticipated by the debtor is not impossible, such possibility does not amount to proof that an effective reorganization is likely in the near future." *Id.* at 628.

The Debtor distinguishes *Boca* in several ways. In our case, the property is improved with a golf course. Also, the property is income producing; according to La-Salle Bank's appraiser, it will have a stabilized net operating income of $650,000. Finally, under the proposal the Debtor currently favors, the Debtor contends that the property can be developed without a change in the underlying zoning although whether that is correct is not clear.

These differences, however, do not persuade us that *Boca* is inapplicable. While the property is improved with a golf course, a golf course is only a small part of the development plan the Debtor wants to effect. The property produces income, but that income will not finance the development. The Debtor has no construction financing commitment in place. Finally, even the more modest plans that the Debtor now proposes require the approval of several public bodies as well as several major undertakings by the City of Highland Park, even if re-zoning is not necessary. The multi-stage approval process has not even begun. And the extensive evidentiary record in this case establishes that obtaining necessary governmental approvals for a major development is a difficult and complex process.

A more recent case, *In re Ledgemere Land Corp.*, 125 B.R. 58 (Bkrtcy.D.Mass. 1991) considered a series of properties. The Bellingham property did not require re-zoning; in fact the Debtor had already received a permit to construct the shopping center it planned to build. However, construction had not begun, the Debtor had no equity, no lease commitments, and had received a purchase offer for only one site. The Massachusetts real estate market had been declining for some time, although the court did speculate that it might have reached its nadir. In light of all these facts, the court lifted the stay. By comparison in our case, the real estate market is less depressed, but the approval process and financing have yet to begin. See also *In re St. George Island*, 1987 Bankr. LEXIS 1586, in which the court lifted the stay when construction had not begun and the Debtor's marketing plan was embryonic.

We find that both the original plan and the recent alternative proposal are too speculative to meet the *Timbers* test of "reasonable possibility of a successful reorganization within a reasonable time." *Timbers* at 375–76, 108 S.Ct. at 632. Obtaining the required approvals is far from certain. Although the Debtor asserts that under its new 178 unit proposal, re-zoning is not required, in fact, the Debtor at least would have to obtain a special use, Planned Residential District, "PRD", permit. Several local and federal bodies would need to approve the plan. Furthermore, the plan requires the City of Highland Park to undertake the construction of Western Avenue and the storm water management system. The Debtor asserts, "There is certainly a reasonable likelihood that the City Council would make a decision on the new PRD within a reasonable period of time," (Post–Trial Brief p. 8). This assertion is based on a series of contingencies and speculation on the part of several of the Debtor's witnesses, whose testimony was often at odds with that of LaSalle Bank's witnesses, and on occasion with each other. Such proof does not satisfy the Debtor's burden and this Court cannot find that favorable governmental actions are reasonably possible within a reasonable time frame.

Furthermore, approvals are only a part of the problem. The Debtor must also show that it has a reasonable prospect of financing, and here its case is even weaker. Even in 1989, when the market was up, the Debtor was unable to obtain financing for the plan then contemplated. Although the currently proposed plan may be less ambitious, potential lenders are now more risk-adverse. The Scarsdale Letter does not solve the Debtor's financing problem. Four hundred thousand dollars is very little compared to the development costs the Debtor will incur. The Letter is not binding, a fact clearly stated in the letter itself. The check is to be held until a satisfactory agreement is entered into and approved by this Court. This does not constitute reasonably prospective financing. *In re Southern Intern. Co. L.P.*, 126 B.R. 223, 226 (Bkrtcy.E.D.Va.1991).

We find that the Debtor has not shown that there is a "reasonable possibility of a successful reorganization within a reasonable time." Consequently, the Debtor has not met its burden under § 362(g). For this reason, LaSalle Bank's motion to modify the stay will be granted.

## II. *Motion to Dismiss or Convert*

In the alternative, LaSalle Bank has moved that these cases be dismissed or converted to Chapter 7. LaSalle Bank has not demonstrated that any of the conditions under § 1112(b) for dismissal or conversion are present. Nor has LaSalle Bank shown that this was a bad faith filing. *In re Park Place Assoc.*, 115 B.R. 940, 946 (Bkrtcy. N.D.Ill.1989). Consequently, LaSalle Bank's motion to dismiss or convert will be denied.

## III. *Motion for Sequestration of Proceeds*

LaSalle Bank asserts a right to $133,250 which it claims was generated by the country club and has been held by the Debtor in its Niles bank account since before the bankruptcy filing. LaSalle Bank also asserts that post-petition receipts from

pre-petition receivables, membership contracts, and sale of equipment are its cash collateral. LaSalle Bank asks that the Court 1) turn over the pre-petition revenues and post-petition proceeds, 2) sequester pre-petition revenues and post-petition proceeds, or 3) prohibit the Debtor's use of pre-petition revenues and post-petition proceeds.

"The burden of proof as to the issue of whether the Bank's lien reaches the post-petition property lies with the Bank." *In re Grassridge Industries*, 78 B.R. 978, 980 (Bkrtcy.W.D.Mo.1987). In construing § 552(b), "Post-petition effect of security interest," bankruptcy courts look to state law. *In re Investment Hotel Properties, Ltd.*, 109 B.R. 990, 997 (Bkrtcy.D.Col.1990). The Illinois U.C.C. establishes that:

> In the event of insolvency proceedings instituted by or against a debtor, a secured party with a perfected security interest in proceeds has a perfected security interest only in the following proceeds:
>
> (b) in identifiable cash proceeds in the form of money which is neither commingled with other money nor deposited in a deposit account prior to the insolvency proceedings;
>
> (d) in all cash and deposit accounts of the debtor in which proceeds have been commingled with other funds, but the perfected security interest under this paragraph (d) is
>
> (ii) limited to an amount not greater than the amount of any cash proceeds received by the debtor within 20 days before the institution of the insolvency proceedings less the sum of (I) the payments to the secured party on account of cash proceeds received by the debtor during such period and (II) the cash proceeds received by the debtor during such period to which the secured party is entitled under paragraphs (a) through (c) of this subsection (4). Ill.Rev.Stat. Ch. 26 § 9–306(4).

The Illinois case that is most helpful is *C.O. Funk & Son, Inc. v. Sullivan Equipment*, 92 Ill.App.3d 659, 48 Ill.Dec. 24, 415 N.E.2d 1308 (1981), aff'd 89 Ill.2d 27, 59 Ill.Dec. 85, 431 N.E.2d 370 (1982). "We find no case dealing with section 9–306 which has enunciated the evidentiary standard that a secured party must meet in proving that something constitutes identifiable proceeds of collateral. Our only guidance therefore comes from the somewhat stark language of the statute. We think that the use of the word 'identifiable' in section 9–306(2) indicates a legislative intent that a secured party present evidence that proves that the alleged proceeds arose directly from the sale or other disposition of collateral and that these alleged proceeds cannot have arisen from any other source." *Id.* at 1313. *Funk* considered § 9–306(2), but the reasoning applies as well to § 9–306(4). The Illinois Appellate Court quoted *Howarth v. Universal CIT Credit Corp.*, 203 F.Supp. 279 (W.D.Pa. 1962). "The court may not assume the source of the money in the bank. The burden is upon UCIT to trace proceeds received ... from the disposition of secured collateral into the bank deposits." *Funk* at 1314. (Two Northern District of Illinois bankruptcy cases have relied on *Funk* in interpreting 9–306, albeit not for exactly this proposition. *In re Datair Systems Corp.*, 42 B.R. 241, 245 (Bkrtcy. N.D.Ill.1984), *In re Mark Twain Marine Industries Inc.*, 115 B.R. 948, 951 (Bkrtcy. N.D.Ill.1990).)

LaSalle Bank has not adequately traced the proceeds it claims. It points us to the testimony of William Spatz, President of the Debtor, and to the Debtor's schedules. Schedule B–2, Personal Property, lists a deposit with American National Bank in the amount of $456 and a deposit with First National Bank of Niles in the amount of $133,250.59. This establishes nothing more than what funds are currently held in the Debtor's name. Spatz' testimony lends some support to LaSalle Bank's contention that the money in the Niles Bank account comes from the income from the country club operations. It does not, however, establish that there is no other source of funds for that account, and in fact, Spatz specifically testified that loans to River Park might be deposited in that account in the future. Spatz' Testimony, May 13,

1991, pp. 40–42. LaSalle Bank has presented no evidence regarding when the funds were put into the account, disbursements from the account, or other information required under § 9–306(4)(d)(ii).

In regard to its right to proceeds, both pre- and post-petition, LaSalle Bank has failed to meet the evidentiary standards. Its Motion to Sequester Proceeds and to Prohibit the Use of Proceeds is denied.

IV. *Motions Regarding the Exclusivity Period*

Initially, the LaSalle Bank also moved to shorten the period during which only the Debtor may file a plan and solicit acceptances under 11 U.S.C. § 1121, but that motion is now moot because those periods have expired and no plan has been filed. The Debtors, however, have moved to extend the time they have the exclusive right to file a plan. As a practical matter, that motion may be of little significance because the stay prohibiting foreclosure of the Debtor's only significant asset has now been lifted. But the Debtor has demonstrated that the complexities of this case warrant an extension, should the Debtor be in a position to propose a plan.

The time in which the Debtor has the exclusive right to file a plan is extended to September 17, 1991, and the time to solicit acceptances is extended to November 18, 1991.

Separate orders will be entered in accordance with this opinion.