In re John Robert WESTPFAHL and
Patricia Ellen Westpfahl,
Debtors.

John Robert WESTPFAHL and Patricia
Ellen Westpfahl, Plaintiffs,

v.

Michael D. CLARK, Standing Chapter 12
Trustee, and United States of America,
acting through Kenneth C. Meeker,
United States Trustee for Region 10, De-
fendants.

In re Thomas Lee FERGUSON and
Catherine Ann Ferguson,
Debtors.

Thomas Lee FERGUSON and Catherine
Ann Ferguson, Plaintiffs,

v.

Michael D. CLARK, Standing Chapter 12
Trustee, and United States of America,
acting through Kenneth C. Meeker,
United States Trustee for Region 10, De-
fendants.

In re LaVern Ervin LARSON, a/k/a
Bernie Larson, and Marion Jean
Street–Larson, Debtors.

In re Rowan Eugene HEBB, Debtor.

In re David A. THOMPSON and Patricia
A. Thompson, Debtors.

Bankruptcy Nos. 92–82691, 92–91658,
93–81825, 93–82159 and 93–80994.
Adv. Nos. 93–8168, 93–9041.

United States Bankruptcy Court,
C.D. Illinois.

Aug. 31, 1994.

Barry M. Barash, Barash & Stoerzbach, Galesburg, IL, for plaintiffs Westpfahls and Fergusons, and debtors Larsons, Hebb and Thompsons.

Andrew W. Covey, Peoria, IL, for defendant Michael D. Clark, Standing Chapter 12 Trustee.

Michael D. Clark, Chapter 12 Trustee, Peoria, IL.

Robert Lindstrom, Mustain & Lindstrom, Galesburg, IL, for AgriBank, FCB in Farwell.

Jeffrey B. Moorhouse, Califf & Harper, P.C., Moline, IL, for First Midwest Bank in Farwell.

Michael E. Massie, Galva, IL, for Charles Meyers in Larson.

LeAnna L. Karnopp, Vonachen, Lawless, Trager & Slevin, Peoria, IL, for Princeville State Bank in Larson and for Lynne Hebb in Hebb.

Kathleen Butler, Thomson & Weintraub, Bloomington, IL, for Tina Wilson Graves in Larson.

Gerard A. Brost, Asst. U.S. Atty., Peoria, IL, for Commodity Credit Corp. and Farmers Home Admin. in Larson and Farmers Home Admin. in Thompson.

Anne C. Phelps, Rennick & Rennick, Wyoming, IL, for Marcus Plotner in Larson.

Jim Dodge, Springfield, IL, for State of Ill. in Larson.

Paul W. Bridenhagen, Executive Office of the U.S. Trustee, Washington, DC.

Laurie M. Judd, Quinn, Johnston, Henderson & Pretorius, Peoria, IL, for Equitable Agri–Business, Inc., in Thompson.

Kurt J. Horberg, Telleen, Telleen, Braendle, Horberg & Thurman, Cambridge, IL, for State Bank of Annawan in Thompson.

Ronald Weber, Froehling, Taylor & Weber, Canton, IL, for Nat. Bank of Canton in Hebb.

Dale Haake, Katz, McAndrews, Balch, Lefstein & Fieweger, P.C., Rock Island, IL, for Reynolds State Bank in Westpfahl.

John G. Ames, Orion, IL, for Kathryn Curry in Westpfahl.

## OPINION

WILLIAM V. ALTENBERGER, Chief Judge.

The issue before the Court represents the second stage of hearings to determine if the Chapter 12 Debtors may make direct payments to creditors, thereby bypassing the Chapter 12 Trustee and avoiding his statutory fee. At the first stage, this Court denied numerous challenges to the legal status of the Chapter 12 Trustee, and the manner in which his fees are calculated, but held that in general a Chapter 12 debtor was not precluded from making direct payments to creditors without recompense to the Chapter 12 Trustee and that a further hearing was necessary to determine when direct payments should be approved. *In re Westpfahl,* 168 B.R. 337 (Bkrtcy.C.D.Ill.1994). A subsequent hearing was held and the matter was taken under advisement.

Several general conclusions can be drawn from the subsequent hearings. First, no creditor has objected to direct payments. Second, the Chapter 12 Trustee has not maximized his statutory compensation and it does not appear he is close to doing so. Third, by permitting both a Debtor and a Chapter 12 Trustee to make payments to creditors, the ability of a Chapter 12 Trustee to supervise and control the plan and the payments to creditors is made more difficult. Split sources of payment lack a continuity a single source of payment provides.

■ In its previous Opinion, this Court listed thirteen factors that other courts had considered in determining if direct payments were appropriate and indicated there could be others. An important factor to consider is the type of debt which the Debtors propose to directly repay. In all these cases, the Debtors propose to directly pay long term secured real estate debt. Neither the Chapter 12 Trustee nor the U.S. Trustee has given any reason why that is inappropriate. To the contrary, there are several reasons which support direct payments. The debt is long term which exceeds the life of the plan. The real estate cannot be disposed of so as to adversely affect a creditor's rights. Historically, except for the period in the early to mid 1980's when farm real estate prices experienced a sharp drop, real estate has been a stable form of security. The secured creditor is protected and except for an indirect benefit of continuity which the Chapter 12 Trustee brings to the reorganization, the secured creditor receives little benefit from the reorganization. Furthermore, Chapter 12 of the Bankruptcy Code is patterned after Chapter 13 of that Code. In a Chapter 13 case the trustee routinely permits Chapter 13 debtors to directly pay long term secured real estate debt. This Court can see no reason why long term secured real estate debt in a Chapter 12 should be treated differently.

■ A second type of debt in these cases is short term secured equipment loans. Creditors holding this type of debt signed stipulations wherein they agreed to be paid direct. However, they are in a slightly different situation than creditors holding secured real estate debts. Their collateral is subject to depreciation. It is important that the payments be made timely or a situation could develop where the value of the collateral will drop without a concurrent reduction in the loan balance. At the subsequent hearings, the Debtors' attorney indicated that, from a debtor's point of view, it was important to have certainty as to what a court expected in a debtor's plan and that to have a consistent policy short term secured equipment loans should be paid through the trustee. This Court would agree.

■ A third type of debt involves taxes. These in turn can be subclassified into real estate taxes and other taxes due the federal and state governments. Real estate taxes need not be paid through the Chapter 12 Trustee as they are secured by a tax lien and one way or another will be paid. Therefore, the supervision and continuity a trustee provides is not needed to insure payment. As to the other type of taxes, while they are given special status and protection under the Bankruptcy Code and federal and state statutes, that status and protection is limited. It has been this Court's experience that in some instances taxes are the first expense which prepetition debtors stop paying. Once a plan of reorganization has been confirmed debtors

can stop paying prepetition taxes and incur more post-petition taxes. So the supervision and continuity a Chapter 12 trustee brings to the reorganization process will help to insure payment of taxes. Therefore, non real estate taxes included in a Chapter 12 plan should be paid through the Chapter 12 Trustee.[1]

■ Another factor to consider is the source of the funds for the payments. In two of the cases before this Court the Debtors propose to liquidate collateral and pay creditors. The Chapter 12 Trustee plays a very minor role in this part of these two Chapter 12 plans and no good reason has been put forth which would justify burdening the Chapter 12 plans with a fee on those payments.

The Chapter 12 Trustee argues the various factors involved in these cases for the most part cancel out each other leaving two in conflict, the ability of the Debtor to achieve a meaningful reorganization versus the Chapter 12 Trustee being reasonably compensated for his services. The record was not fully developed in this regard. As would be expected, the Debtors testified they needed to make direct payments to have successful plans, while the Chapter 12 Trustee testified the plans would cash flow if the payments were made through him. From the Chapter 12 Trustee's perspective there wasn't any detailed evidence concerning his duties and his expenses and expected profit. While there was a general reference to his statutory duties under § 1202 of the Bankruptcy Code, 11 U.S.C. § 1202, there was very little specifics as to how he was performing those duties. Nor was there any specifics as to his expenses, with limited testimony as to his profitability. The Chapter 12 Trustee testified he lost money the first year of service, made a profit of $1,000.00 the second, and was making $5,000 to $6,000 profit in the third year, which is not yet completed. That is the type of profit pattern that would be expected with a start-up endeavor.

In balancing these factors, several points need to be made. First, most courts recognize that most Chapter 12 plans are thin and are designed to do what is necessary to achieve success. Second, the Chapter 12 Trustee does provide valuable services to a Chapter 12 case. The Chapter 12 Trustee supervises the operation of the plan and keeps the Court informed as to its status, thereby bringing a continuity to the debtor's affairs. He is entitled to be paid for those services. The creditors want to be paid, the debtors want to retain their farms, the debtor's attorney is paid. There is no reason why the Chapter 12 Trustee should be considered an inferior player in the game of reorganization and be penalized in order to have a successful plan of reorganization. If a debtor is to reorganize, the debtor must be able to fund all the parties to it. If a debtor cannot do so, he is not reorganizable.

■ At the subsequent hearings, the Chapter 12 Trustee testified that he expected to take the good with the bad and that on average to be reasonably compensated. That is a realistic position to take. Attached as Schedules 1–5 to this Opinion are updated charts, prepared by this Court, which show the amounts being offered by the Debtors, being requested by the Chapter 12 Trustee, and to be paid the Chapter 12 Trustee based on this Court's opinion. On average he is being paid approximately $8,300.00 per case. Based on the evidence and this Court's general knowledge of the Chapter 12 Trustee efforts in Chapter 12 cases, that is a reasonable figure.

This Court will now turn its attention to the specific cases before it. *In re Thompson,* No. 93–0994, complies with the holdings set forth above and should be confirmed. *In re Hebb,* No. 93–82159, and *In re Larson,* No. 93–81825, with one exception, also comply with the above holdings and are confirmable. The one exception is that the Chapter 12 plans should be modified to provide that the short term secured equipment loans should be paid through the Chapter 12 Trustee.

1. As a general rule, post-petition taxes are not included in a Chapter 12 plan and are paid direct by a debtor. This Opinion is not suggesting post-petition taxes be paid through the Chapter 12 Trustee. However, the debtor may elect to do so. For example, a debtor may elect to include in a Chapter 12 plan post-petition taxes coming due before confirmation. If so included, those post-petition taxes should be paid through the Chapter 12 Trustee.

Both *In re Ferguson,* No. 92–91658, and *In re Westpfahl,* No. 92–82691, need more changes to be confirmable. First, both Chapter 12 plans need to be modified to provide that the non real estate taxes will be paid through the Chapter 12 Trustee. Second, in both cases the Chapter 12 plans provide the Chapter 12 Trustee's fee is equal to the amount being paid to unsecured creditors. That exceeds the 10% fee prescribed by the statute. Therefore, the Chapter 12 plans need to be modified to limit the Trustee's fee on payments to unsecured creditors to 10% of those payments. Finally, in both *Ferguson,* and *Westpfahl,* with the exception of the Reynolds State Bank loan, the plans need to be amended to provide the short term secured equipment loans will be paid through the Chapter 12 Trustee. The loan by the Reynolds State Bank in *Westpfahl* need not be paid through the Chapter 12 Trustee as it is a revolving loan which involves not only repaying old debt, but the incurring and repaying of new post-petition debt as part of the debtor's ongoing operations.[2]

In *In re Larson,* there is an additional objection to confirmation filed by Marcus Plotner (PLOTNER) which is unrelated to the issue involving the computation of the Chapter 12 Trustee's fee. PLOTNER, a former landlord of the LARSONS, objected to the treatment of his claim under the Chapter 12 plan. The LARSONS rented land from PLOTNER under a crop sharing lease for the 1991 year. The Debtor harvested the crop and sold it through Rumboldt and Kuhn Elevator and used the proceeds to pay the Princeville State Bank, which had a lien on the crops. On August 9, 1993, the LARSONS filed a Chapter 12 petition in bankruptcy, classifying PLOTNER's claim for part of his landlord's share of soybeans as unsecured. PLOTNER objected to the plan, claiming secured status by reason of the statutory landlord's lien under Illinois law and the filing of a Uniform Commercial Code UCC–1 financing statement. A hearing was held on the objection and the parties submitted briefs on the issue.

In his brief filed May 23, 1994, PLOTNER concedes that a statutory landlord's lien is avoidable under § 545 of the Bankruptcy Code. In any event, the lien afforded landlords under Illinois is only of limited duration. The statute provides that the lien continues for a period of six months after the termination of the lease. 735 ILCS 5/9–316 (1992). While a copy of the lease between the parties is not a part of the record and this Court is not certain as to the term of the lease, it is without question that the lease expired no later than February, 1992, a date not within the six-month period preceding the filing of the Chapter 12 petition.

PLOTNER also claims that he perfected his lien by filing a UCC–1 financing statement in the Office of the Stark County Recorder on July 10, 1989. While PLOTNER's position is not entirely clear, this Court will construe his contention as best it can. The Uniform Commercial Code has no application to landlord's liens. 810 ILCS 5/9–104(b). Thus, PLOTNER cannot bootstrap his status as holder of a statutory landlord's lien to the umbrella of the Uniform Commercial Code by the filing of a UCC–1 financing statement.

In order for a creditor to claim a security interest in collateral which is enforceable against the debtor under the Uniform Commercial Code, the creditor must either have possession of the collateral or the debtor must have signed a security agreement containing a description of the collateral. 810 ILCS 5/9–203. The record does not contain, nor does it appear that the parties entered into a separate security agreement granting PLOTNER a lien on the crops. The lease is not a part of the record and PLOTNER has not argued that the language of the lease creates a security interest. The only document in the record which could be considered to give rise to a security interest is the UCC–1 financing statement signed by LARSON. A UCC–1 financing statement cannot substitute for a security agreement unless it contains an express grant by the

---

**2.** As indicated earlier in this Opinion, the Chapter 12 Trustee is not entitled to a fee on payments to creditors arising out of the liquidation of collateral (i.e. Mer–Roc FS, Inc. in *Westpfahl* and Household Finance in *Ferguson.*)

debtor creating a security interest in the collateral described. *Victor v. Griffin*, 122 Idaho 395, 834 P.2d 912 (Ct.App.1992); *In re Flores De New Mexico, Inc.*, 151 B.R. 571 (Bkrtcy.D.N.M.1993); *In re Zurliene*, 97 B.R. 460 (Bkrtcy.S.D.Ill.1989). In the present case, as in those cited, the UCC–1 financing statement contains no language indicating that the LARSONS had granted PLOTNER a security interest in the collateral, but merely identifies the collateral.

■ Even if the UCC–1 financing statement created a security interest, PLOTNER's contention that he achieves secured status under the Chapter 12 plan would still fail. Citing § 9–306(2) of the Uniform Commercial Code, (810 ILCS 5/9–306(2), PLOTNER argues that when the crops were sold he continues to have a security interest in the proceeds. A creditor must, however, adequately trace the proceeds it claims. *In re Highland Park Associates Ltd. Partnership I*, 130 B.R. 55 (Bkrtcy.N.D.Ill.1991). The parties have agreed here that the proceeds from the sale of the crop were paid to the Princeville State Bank. PLOTNER has no claim to any monies in the hands of the LARSONS. For the foregoing reasons, PLOTNER's claim is properly treated as unsecured and his objection to the LARSONS' Chapter 12 plan should be overruled.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

SCHEDULE 1.

DEBTOR THOMPSON

| CREDITOR | AMOUNT OF CLAIM | TOTAL PAYMENT (Prin.& Interest) | ANNUAL PAYMENT | PAYOUT TERM | Debtor's proposed Manner of Payment | | FEE | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Direct | Thru Trustee | Under Plan | As Computed by Trustee | Based on Court's Opinion |
| PRIORITY | | | | | | | | | |
| INTERNAL REVENUE SERVICE | $ 4,303 | 5,100 | 1,700 | 3 Yrs. | | x | 510 | 510 | 510 |
| ILLINOIS DEPT. OF REVENUE | 505 | 600 | 200 | 3 Yrs. | | x | 60 | 60 | 60 |
| SECURED | | | | | | | | | |
| Equitable Agri-Business, Inc. First Mortgage, real estate | 75,261 | 159,060 | 7,953 | 20 Yrs.w/10 yr.balloon | x | | -0- | 2,385 | -0- |
| Farmers Home Administration Second Mtg., real estate | 62,786[3] | 111,375 | 4,455 | 25 Yrs. | x | | -0- | 1,338 | -0- |
| Commodity Credit Corp., 1992 crops. | 27,808 | Unimpaired[4] | | | x | | -0- | -0- | -0- |
| State Bank of Annawan, 1992 crops. | 47,648 | Unimpaired | | | x | | | | |
| State Bank of Annawan, Machinery & Equipment | 24,350[5] | 30,895 | 6,179 | 5 Yrs. | | x | 1,854 | 1,854 | 1,854 |
| UNSECURED (Including unsecured components of State Bk.of Annawan $76,088 and Farmers Home Administration $45,261) | 162,319 | 3,000 | 1,000 | 3 Yrs. | | x | 300 | 300 | 300 |
| TOTAL | | | | | | | 2,724 | 6,447 | 2,724 |

[3] According to stipulation filed Nov. 18, 1993.

[4] The Thompsons propose to pay the claims of the Commodity Credit Corporation and the State Bank of Annawan, secured by the 1992 crops, directly, in accordance with the pre-petition contracts and they classify those claims as unimpaired.

[5] According to amended stipulation filed Nov. 9, 1993.

SCHEDULE 2.

| DEBTOR HEBB (3 Yr.Plan) | | | | | Debtor's proposed Manner of Payment | | FEE | | |
|---|---|---|---|---|---|---|---|---|---|
| CREDITOR | AMOUNT OF CLAIM | TOTAL PAYMENT (Prin.&Int.) | ANNUAL PAYMENT | PAYOUT TERM | Direct | Thru Trustee | Under Plan | As Computed by Trustee | Based on Court's Opinion |
| **PRIORITY** | | | | | | | | | |
| Fulton County Collector, Real estate taxes, Tract 1 | $ 470 | 558 | 186 | 3 Yrs. | | x | 54 | 54 | 54 |
| Fulton County Collector, Real estate taxes, Tract 2 | 1,160 | 1,374 | 458 | 3 Yrs. | | x | 138 | 138 | 138 |
| **SECURED** | | | | | | | | | |
| Union Nat'l.Bk.,1st Mtg.Trt.1[6] | 17,975 | 26,170 | 2,617 | 10 Yrs. | x | | -0- | 786 | -0- |
| National Bank of Canton, 1st Mtg. Tract 2 | 28,000 | 57,040 | 2,852 | 20 Yrs. | x | | -0- | 855 | -0- |
| Lynn Hebb, Judgment Liens Tracts 1 & 2[7] | 49,000 | 85,875 | 5,725 | 15 Yrs. | x | | -0- | 1,719 | -0- |
| Farmers Home Admin,, 1993 crops. | | Unimpaired[8] | | | x | | -0- | -0- | -0- |
| National Bank of Canton, 1993 crops. | 55,800 | Unimpaired 6 | | | x | | -0- | -0- | -0- |

[6]According to a stipulation filed Dec. 22, 1993. The payments on this claim are to be made on a monthly basis.

[7]Originally, HEBB asserted that the junior lien on the real estate held by his former spouse, Lynne Hebb, was a voidable preference and he treated her claim as unsecured. An adversary proceeding had been filed and Lynne Hebb contended that the lien was not avoidable. Her objection to the plan was taken with that proceeding and an agreement was reached during the trial held on April 26, 1994. Hebb filed a first amended plan on May 2, 1994, prior to the issuance of this Court's previous opinion on May 17, 1994. Because this Court needed to establish a cut-off date with respect to finalization of its opinion, the changes effected by the first amended plan were not considered by the Court in its previous opinion. Under the terms of the first amended plan, Lynne Hebb holds a secured claim in the amount of $49,000, payable directly by HEBB over a fifteen-year period. As a part of the agreement, HEBB is to execute a junior mortgage to secure the claim. The stipulation further provides that Lynne Hebb will have no unsecured claim.

[8]HEBB's plan provides that the claims of the Farmers Home Administration, National Bank of Canton, and Spoon River FS, all secured by the 1993 crops, will be paid direct, in accordance with the terms of the prepetition contract and are unimpaired.

338

| DEBTOR HEBB (3 Yr. Plan) | | | | | Debtor's proposed Manner of Payment | | | FEE | |
|---|---|---|---|---|---|---|---|---|---|
| CREDITOR | AMOUNT OF CLAIM | TOTAL PAYMENT (Prin.&Int.) | ANNUAL PAYMENT | PAYOUT TERM | Direct | Thru Trustee | Under Plan | As Computed by Trustee | Based on Court's Opinion |
| Spoon River FS, 1993 crops | 64,335 | Unimpaired [6] | | | x | | -0- | -0- | -0- |
| Tarter Feed & Fertilizer, 1993 crop. | 32,624 | Unimpaired [9] | | | x | | -0- | -0- | -0- |
| Farmers Home Administration, Machinery & Equipment | 65,605 | 79,366 | 11,338 | 7 Yrs. | x | | -0- | 3,399 | 3,399 |
| Tompkins State Bank, Cultivator and mulch finisher | 7,950 | 9,955 | 1,991 | 5 Yrs. | | x | 995 | 995 | 995 |
| National Bank of Canton, Pick-up Truck | 6,200 | 7,218 | 2,406 | 3 Yrs. | | x | 720 | 720 | 720 |
| Donald Lowe (Landlord), 1993 cash rent | 5,750 | Unimpaired [10] | | | x | | -0- | -0- | -0- |
| Ken Johnson (Landlord), 1993 cash rent | 5,500 | Unimpaired | | | x | | -0- | -0- | -0- |
| Freeman United Coal Co., 1993 cash rent | 4,320 | Unimpaired | | | x | | -0- | -0- | -0- |
| UNSECURED [11] | 33,999 | 13,600 | 4,533 | 3 Yrs. | | x | 1,359 | 1,359 | 1,359 |
| TOTAL | | | | | | | 3,266 | 10,025 | 6,665 |

[9] While the plan filed by HEBB provides that the cash collateral claim of Tarter Feed & Fertilizer is unimpaired and will be paid in accordance with the prepetition contract, the schedule attached to the plan lists the value of the collateral securing the claim as -0- and shows the full amount of the debt as unsecured.

[10] The plan filed provides that the claims of Donald Lowe, Ken Johnson and Freeman United Coal Co., for 1993 cash rent, are unimpaired and will be paid directly by HEBB.

[11] The first amended plan, referred to above in Note 5, provides that unsecured creditors will receive 40% of their claims, at the rate of 13.3% annually, for a period of three years. The trustee's fee is fixed at 10% of the amount actually distributed to creditors.

SCHEDULE 3. [12]

| DEBTOR: LARSON | Modified Plan Filed 3-29-94 | | | | Debtor's proposed Manner of Payment | | FEE | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| CREDITOR | AMOUNT OF CLAIM | TOTAL PAYMENT (Prin.&Int.) | ANNUAL Payment | PAYOUT TERM | Direct | Thru Trustee | Under Plan | As Computed by Trustee | Based on Court's Opinion |
| PRIORITY | | | | | | | | | |
| Illinois Dept. of Revenue | $ 945 | 1,119 | 373 | 3 Yrs. | | x | 111 | 111 | 111 |
| Internal Revenue Service | 6,245 | 7,401 | 2,467 | 3 Yrs. | | x | 738 | 738 | 738 |
| Stark County Collector | 2,842 | 3,369 | 1,123 | 3 Yrs. | | x | 336 | 336 | 336 |
| Peoria County Collector | 1,298 | 1,539 | 513 | 3 Yrs. | | x | 153 | 153 | 153 |
| SECURED | | | | | | | | | |
| Travelers Insurance Co., First Mtg., real estate Tract 1. | 56,660 | FN [13] | 5,422 | Amort.25 yr. 5 yr. balloon | x | | -0- | 1,807 | -0- |
| H. & M. Fritch, 1st Mortgage, Tract 2 | 34,618 | | 3,658 | 20 yr.-6yr. balloon | x | | -0- | 1,098 | -0- |
| M. C.Tucker, Contract seller, Tract 3 | 93,990 | FN 11 | 8,349 | Amort.30 yr. 10 yr. balloon | x | | -0- | 2,505 | -0- |
| Farmers Home Administration, 2nd Mortgage | 121,794 | 237,690 | 7,923 | 30 Yrs. | x | | -0- | 2,276 | -0- |
| Commodity Credit Corp., '92 corn & beans | 26,625 | Unimpaired [14] | | | x | | -0- | -0- | -0- |

[12] The LARSONS filed a Second Modified plan on March 29, 1994. The changes effected by this plan were not reflected in this Court's previous Opinion. Like the amended plan filed in HEBB, the LARSONS' Second Modified plan was filed after the cut-off date which this Court had fixed with respect to finalization of its previous decision.

[13] The Court has not computed the total payment to be received by Travelers Insurance Co. or by Maureen Tucker on their claims. The claim of Travelers is to be amortized over 25 years with interest at 8.25%, with a balloon payment due on February 1, 2000. Tucker's claim is to be amortized over 30 years with interest at 8% with a 10-year balloon.

**DEBTOR: LARSON   Modified Plan Filed 3-29-94**

| CREDITOR | AMOUNT OF CLAIM | TOTAL PAYMENT (Prin.&Int.) | ANNUAL Payment | PAYOUT TERM | Debtor's proposed Manner of Payment | | FEE | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Direct | Thru Trustee | Under Plan | As Computed by Trustee | Based on Court's Opinion |
| Kraft Fertilizer, 1993 crop | 19,410 | Unimpaired FN 12 | | | x | | -0- | -0- | -0- |
| Princeville State Bank, 1993 crop.[15] | 81,681 | Unimpaired FN 12 | | | x | | -0- | -0- | -0- |
| Henry Kell (landlord) cash rent | 380 | Unimpaired FN 12 | | | x | | -0- | -0- | -0- |
| George Taylor (landlord) Cash rent | 8,216 | Unimpaired FN 12 | | | x | | -0- | -0- | -0- |
| Robert Hendrick (landlord, Cash rent | 4,080 | Unimpaired FN 12 | | | x | | -0- | -0- | -0- |
| C & B German (landlord) cash rent | 4,387 | Unimpaired FN 12 | | | x | | -0- | -0- | -0- |
| EJM Partnership (landlord) cash rent | 12,450 | Unimpaired FN 12 | | | x | | -0- | -0- | -0- |
| Princeville State Bank, Machinery & Equip.[16] | 148,300 | 190,634 | 38,126 | 5 Yrs | x | | -0- | 11,439 | 11,439 |
| Princeville State Bank, cow herd | 6,853 | 7,470 | 7,470 | 1 Yr. | x | | -0- | 747 | 747 |
| UNSECURED | 179,052 | 10,500 | 3,500 | 3 Yrs. | | x | 1,050 | 1,050 | 1,050 |
| TOTAL | | | | | | | 2,388 | 22,260 | 14,574 |

[14]The claims secured by the 1993 crop are to be paid directly by the LARSONS in accordance with the terms of the prepetition agreements and are classified as unimpaired. The claims of the landlords secured by a landlords' lien on the 1993 crops are unimpaired and are to be paid directly by the LARSONS from the first proceeds of the current crop.

[15]The schedules attached to the LARSONS' plan list the amount of the debt to the Princeville State Bank secured by the 1993 crop as $248,484.00, and show the value of the collateral as $81,681.00. The unsecured component of the claim is listed at $143,600.00 and is included in the unsecured claims in that amount.

[16]According to a stipulation filed June 2, 1994.

SCHEDULE 4

DEBTOR: WESTPFAHL

| CREDITOR | AMOUNT OF CLAIM | TOTAL PAYMENT (Prin&Int) | ANNUAL Payment | PAYOUT TERM | Debtor's proposed Manner of Payment | | FEE | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Direct | Thru Trustee | Under Plan | As Computed by Trustee | Based on Court's Opinion |
| PRIORITY | | | | | | | | | |
| Internal Revenue Service | $ 4,185 | 5,380 | 1,076 | 5 Yrs. | x | | -0- | 324 | 324 |
| Rock Island Co. Collector | 1,169 | 1,505 | 301 | | x | | -0- | 90 | -0- |
| SECURED | | | | | | | | | |
| Katherine Curry, 1st mortgage, Tract 1 | 80,663 | 124,919 | 8,223[17] | 15 Yrs. | x | | -0- | 2,600 | -0- |
| Mer-Roc FS, Inc.,stock & crops[18] | 6,199 | | | 30 days after confirmation | x | | -0- | 620 | -0- |
| Ford Motor Credit Co., Pick up Truck | 7,825[19] | 8,829 | 2,943 | 3 Yrs. | x | | -0- | 882 | 882 |
| Doonan Implement Co.,bulldozer | 2,212[20] | 2,622 | 874 | 3 Yrs. | x | | -0- | 261 | 261 |
| John Deere Co.,tractor & loader | 7,208[21] | 8,544 | 2,848 | 3 Yrs. | x | | -0- | 855 | 855 |
| John Deere Co.,field cultivator | 1,134 | 1,344 | 448 | 3 Yrs. | x | | -0- | 135 | 135 |
| Bank One, cattle trailer | 3,600 | 4,266 | 1,422 | 3 Yrs. | x | | -0- | 426 | 426 |

[17] According to a stipulation filed March 26, 1993, the WESTPFAHLS will pay Katherine Curry $2,000.00 on confirmation and the payments will be made on a monthly basis.

[18] Pursuant to a stipulation, Mer-Roc FS, Inc. will redeem its stock giving the WESTPFAHLS a credit of approximately $2,465.47. The balance of the claim, secured by 1992 crops, will be paid in full within 30 days of confirmation. Again, the Court is unsure of the fee the Standing Trustee would claim as to this transaction but the Court has computed the fee on the full amount of the claim.

[19] This claim will be paid in monthly installments in accordance with a stipulation filed February 1, 1993.

[20] According to a stipulation filed March 15, 1993.

[21] John Deere Co. entered into a stipulation to accept the plan on March 22, 1993.

**DEBTOR: WESTPFAHL**

| CREDITOR | AMOUNT OF CLAIM | TOTAL PAYMENT (Prin&Int) | ANNUAL Payment | PAYOUT TERM | Debtor's proposed Manner of Payment | | FEE | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Direct | Thru Trustee | Under Plan | As Computed by Trustee | Based on Court's Opinion |
| Brenton First National Bank, Manure spreader | 2,500 | 3,215 | 643 | 5 Yrs. | x | | -0- | 192 | 192 |
| Reynolds State Bank, machinery, equipment, hogs & dairy cattle | 185,270²² | | 27,000 | | x | | -0- | 8,100 | -0- |
| UNSECURED | 101,504 | 3,000 | | | | x | 3,000 | 600 | 600 |
| TOTAL | | 3,000 | | | | | 3,000 | 15,085 | 3,675 |

²²Pursuant to a stipulation to accept the plan filed April 29, 1993, the combined claim of Reynolds State Bank, secured by machinery and equipment, hogs and dairy cattle is to be paid as follows:

1. Assignment of $2,000 per month from milk checks; provided that by Feb. 1 of each year, a total payment of not less than $27,000 (including total amounts paid throughout the year from milk checks).

2. 100% of the net proceeds from sale of any machinery.

3. 100% of the net proceeds from the sale of any breeding stock that are not replaced.

SCHEDULE 5.

DEBTOR: FERGUSON

| CREDITOR | AMOUNT OF CLAIM | TOTAL PAYMENT (Prin&Int.) | ANNUAL PAYMENT | PAYOUT TERM | Debtor's Proposed Manner of Payment | | Under Plan | FEE | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Direct | Thru Trustee | | As Computed by Trustee | Based on Court's Opinion |
| PRIORITY | | | | | | | | | |
| Internal Revenue Service | $ 39,547 | 50,835 | 10,167 | 5 Yrs. | x | | -0- | 3,051 | 3,051 |
| Ill. Dept. Rev. | 3,453 | 4,440 | 888 | 5 Yrs. | x | | -0- | 267 | 267 |
| SECURED | | | | | | | | | |
| First Bank of Wilmington,1st Mortgage Tract 1 | 103,800 | 219,380 | 10,969 | 20 Yrs. | x | | -0- | 3,291 | -0- |
| Agri Bank, FCB, 1st Mortgage Tract 2 | 28,755 | 80,280 | 2,676 | 30 Yrs. | x | | -0- | 804 | -0- |
| Agri Bank, FCB, 1st Mortgage, Tract 3 | 64,341 | 179,610 | 5,987 | 30 Yrs. | x | | -0- | 1,797 | -0- |
| Farmers Home Administration, '92 crop & equip.,2d on tract 3 | 38,304[23] | 64,110 | 4,274 | 15 Yrs. | x | | -0- | 1,281 | -0- |
| John Deere Co.,JD7720 combine | 7,581 | 9,745 | 1,949 | 5 Yrs. | x | | -0- | 585 | 585 |
| John Deere Co.,flex platform & corn head | 13,297 | 16,416 | 4,104 | 4 Yrs. | x | | -0- | 1,230 | 1,230 |
| John Deere Co., tractor | 18,966 | 2,380 | 4,876 | 5 Yrs. | x | | -0- | 1,464 | 1,464 |
| First of America, tractor & trailer | 20,000- | 22,836[24] | 7,632 | 3 Yrs. | x | | -0- | 2,289 | 2,289 |
| Bank of Dwight, 2d on machinery and equipment | 26,000 | 32,560 | 6,512 | 5 Yrs. | x | | -0- | 1,953 | 1,953 |

[23]According to a stipulation filed April 22, 1993.

[24]The claim is to be paid in monthly installments.

| DEBTOR: FERGUSON | | | | | Debtor's Proposed Manner of Payment | | FEE | | |
|---|---|---|---|---|---|---|---|---|---|
| CREDITOR | AMOUNT OF CLAIM | TOTAL PAYMENT (Prin&Int.) | ANNUAL PAYMENT | PAYOUT TERM | Direct | Thru Trustee | Under Plan | As Computed by Trustee | Based on Court's Opinion |
| Household Finance, truck, boat & trailer (stip.April 29, 1993: int. rate 16.9%;sell collateral immediately pay balance 2-1-94) | 10,081 | FN25 | | | | | -0- | 1,008 | -0- |
| UNSECURED | 131,553 | 6,000 | 1,000 | | | x | 3,000 | 600 | 600 |
| TOTAL | | | | | | | 3,000 | 19,620 | 11,439 |

[25] Pursuant to a stipulation entered into by Household Finance on April 29, 1993, the FERGUSONS agreed to sell the collateral immediately and pay any remaining balance by February 1, 1994. Again, the Standing Trustee's position regarding his fee on that transaction is not clear to the Court but for computation purposes the fee has been imposed on the full amount of the claim.

## ORDER

For the reasons set forth in the Opinion entered this day; IT IS HEREBY ORDERED:

1. *In re Thompson,* No. 93–80994, is confirmable and the Debtor has fourteen (14) days within which to submit a confirmation order.

2. *In re Hebb,* No. 93–82159, *In re Larson,* No. 93–81825, *In re Ferguson,* No. 92–91658, and *In re Westpfahl,* No. 92–82691, are not confirmable and confirmation is denied, with the Debtors having fourteen (14) days within which to file amended plans consistent with the Opinion entered this day.